# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | John W. Darrah | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 99 C 8292 | **DATE** | 4/18/2002 |
| **CASE TITLE** | THOMAS J. McRAE vs. JOHN E. POTTER | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m)  ☐ General Rule 21  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] Status hearing held. Enter Memorandum Opinion And Order. Defendant's motion for summary judgment is granted.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | **Document Number** |
|---|---|---|---|---|
| | No notices required. | | number of notices | |
| | Notices mailed by judge's staff. | | | |
| | Notified counsel by telephone. | | APR 19 2002 date docketed | |
| ✓ | Docketing to mail notices. | | | 37 |
| ✓ | Mail AO 450 form. | | CDY docketing deputy initials | |
| | Copy to judge/magistrate judge. | | | |
| LG | courtroom deputy's initials | | date mailed notice | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

UNITED STATES DISTRICT COURT,
NORTHERN DISTRICT OF ILLINOIS,
EASTERN DIVISION

| | |
|---|---|
| THOMAS J. McRAE, | |
| Plaintiff, | Case No. 99 C 8292 |
| v. | The Honorable John W. Darrah |
| JOHN E. POTTER, Postmaster General of the United States, | |
| Defendant. | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Thomas J. McRae ("Plaintiff"), filed a *pro se* single-count complaint against Defendant, John E. Potter ("Defendant"), alleging that Defendant discriminated against him by terminating him and failing to reasonably accommodate his disability. Counsel was subsequently appointed to represent Plaintiff. Defendant moves for summary judgment pursuant to Federal Rule of Civil Procedure 56.

For the reasons that follow, Defendant's Motion for Summary Judgment is granted.

## LEGAL STANDARD

Summary judgment is appropriate when there remains no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Cincinnati Ins. Co. v. Flanders Elec. Motor Serv., Inc.*, 40 F.3d 146, 150 (7th Cir. 1994). "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses . . . ." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Thus,

although the moving party on a motion for summary judgment is responsible for demonstrating to the court why there is no genuine issue of material fact, the non-moving party must go beyond the face of the pleadings, affidavits, depositions, answers to interrogatories, and admissions on file to demonstrate through specific evidence that there remains a genuine issue of material fact and show that a rational jury could return a verdict in the non-moving party's favor. *Celotex*, 477 U.S. at 322-27; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254-56 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986); *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 923 (7th Cir. 1994).

Disputed facts are material when they might affect the outcome of the suit. *First Ind. Bank v. Baker*, 957 F.2d 506, 507-08 (7th Cir. 1992). When reviewing a motion for summary judgment, a court must view all inferences to be drawn from the facts in the light most favorable to the opposing party. *Anderson*, 477 U.S. at 247-48; *Popovits v. Circuit City Stores, Inc.*, 185 F.3d 726, 731 (7th Cir. 1999). However, a metaphysical doubt will not suffice. *Matsushita*, 475 U.S. at 586. If the evidence is merely colorable or is not significantly probative or is no more than a scintilla, summary judgment may be granted. *Anderson*, 477 U.S. at 249-250.

## BACKGROUND

The undisputed facts taken from the parties' Local Rule 56.1(a) & (b) statements of material facts [1] (referred to herein as "Pl.'s 56.1" and "Def.'s 56.1") and exhibits are as follows.

---

[1] LR. 56.1(b) provides that the party opposing summary judgment will file "a concise response to the movant's statement that shall contain ... a response to each numbered paragraph in the moving party's statement, including, in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon". Plaintiff has provided responses which deny Defendant's statements without any support from the record. A court may strike 56.1 statements in their entirety when they contain evasive answers and improper argument as such tactics defeat the purpose for which Rule 56.1 was implemented.

The Bellwood Post Office employs letter carriers, clerks, supervisors, a custodian, and a postmaster. (Def.'s 56.1 ¶ 2.) The letter carriers cover fourteen routes, all of which have the same physical demands. (Def.'s 56.1 ¶ 2.) The duties of a letter carrier are to report to work on time, remove the mail from the carrier's case, sort the mail, tie it into delivery sequence, load the mail onto a vehicle, deliver the mail along the assigned route, and return to the post office before punching out and going home. (Def.'s 56.1 ¶ 2.)

Plaintiff was employed by the United States Postal Service ("USPS") as a letter carrier at the Bellwood Post Office beginning in February 1988. (Def.'s 56.1 ¶ 1.) Plaintiff tore a ligament in his left knee while playing basketball and subsequently discovered that he had degenerative arthritis in that knee. (Def.'s 56.1 ¶ 3.) In May 1996, Plaintiff's doctor wrote a note stating that Plaintiff has trouble kneeling and climbing stairs because of the degenerative changes in his knee. (Def.'s 56.1 ¶ 3.) In June 1996, Plaintiff gave his doctor's note to his union steward, who gave it to the postmaster of the Bellwood Post Office, Russell Raymond ("Raymond"). (Def.'s 56.1 ¶¶ 1, 3.) Raymond sent Plaintiff to the USPS physician, who stated that Plaintiff has degenerative joint disease in his left knee and who recommended a change in position from letter carrier to clerk. (Def.'s 56.1 ¶ 4.)

---

*Bordelon v. Chicago School Reform Board of Trustees*, 233 F.3d 524, 528 (7th Cir. 2000). Although the statement has not been struck in its entirety, all 56.1 responses which fall into this category are deemed admitted.

    Plaintiff made a general objection to Defendant's Exhibit C, a transcript of proceedings before the Equal Employment Opportunity Commission, on the basis of authenticity but did not specify the nature of his objection or otherwise deny the paragraphs of Defendant's Rule 56.1 Statement that relied on Exhibit C. In response, Defendant has submitted a certified copy of the entire transcript. The Court has determined that the transcript is authentic. Therefore, the paragraphs of Defendant's Rule 56.1 Statement subject to Plaintiff's objection will be deemed admitted.

At that time, Plaintiff had already been assigned temporary light duty. (Def.'s 56.1 ¶ 5.) Temporarily, Plaintiff was assigned to case the mail, tie it down, and prepare it for delivery by another letter carrier. (Def.'s 56.1 ¶ 5.) Then, Plaintiff would either go home or, if the custodian was not at work, be offered the opportunity to sweep, dust, empty trash cans, etc. (Def.'s 56.1 ¶ 5.)

In June 1996, Plaintiff requested permanent light duty. (Def.'s 56.1 ¶ 6.) There were no permanent light duty positions available in Bellwood. (Def.'s 56.1 ¶ 6.) In addition, in Bellwood, there were no letter carrier positions that did not require climbing stairs and no clerk positions available. (Def.'s 56.1 ¶ 6.) Raymond forwarded Plaintiff's request to the district office and requested assistance in locating a clerk position for Raymond. (Def.'s 56.1 ¶ 7.) Raymond received a list of forty-five post offices in the district with one or more clerk positions open. (Def.'s 56.1 ¶ 7.)

On September 4, 1996, Raymond denied Plaintiff's request for permanent light duty. (Def.'s 56.1 ¶ 8.) Raymond gave Plaintiff the list of available clerk positions, the district telephone directory, and time to call those post offices and arrange a transfer to an available clerk position. (Def.'s 56.1 ¶ 8.) Raymond also suggested that Plaintiff file for disability retirement, and he gave Plaintiff the name and phone number of the person to contact if Plaintiff chose to do so. (Def.'s 56.1 ¶ 8.) Raymond warned Plaintiff that if Plaintiff was unable to secure a transfer before October 25, 1996, Raymond would have to separate Plaintiff from USPS for being unable to perform the duties of the position for which he was hired. (Def.'s 56.1 ¶ 8.) Plaintiff testified that he was agitated and angry because of Raymond's September 4, 1996 letter. (Def.'s 56.1 ¶ 9.) He and his union representative telephoned fewer than five of the post offices on the list. (Def.'s 56.1 ¶ 9.)

On September 11, 1996, another letter carrier, Michael White, told Plaintiff's immediate

supervisor, Ralph Atchue ("Atchue"), that Plaintiff was making gunshot noises, pointing his finger as if it were a gun, and stating that he was going to shoot all of the white rednecks. (Def.'s 56.1 ¶¶ 1, 10.) Plaintiff admits making gunshot noises and saying "bang, bang, shoot them up" but claims that he was only singing a song. (Def.'s 56.1 ¶ 10.)

According to Atchue, Plaintiff had displayed inappropriate and unusual behavior before, such as glaring, staring down people, leaving his pants unzipped and open. (Def.'s 56.1 ¶ 11.) Atchue also testified that Plaintiff had made animal noises, such as clucking or growling, when asked work-related questions. (Def.'s 56.1 ¶ 11.) Atchue believes that Plaintiff has violent or threatening tendencies, and other employees have told Atchue that they felt threatened by Plaintiff. (Def.'s 56.1 ¶ 11.) Earlier, in 1993, Raymond had written the manager of human resources for the district, stating that he was concerned that Plaintiff was unstable because five other employees had told Raymond about hostile and violent acts performed by Plaintiff when Raymond was not present. (Def.'s 56.1 ¶ 12.) In 1994, Raymond placed Plaintiff on emergency off-duty status because another letter carrier complained that Plaintiff had threatened him. (Def.'s 56.1 ¶ 13.) At that time, Raymond sent a letter to the medical unit, attaching four signed statements from employees threatened or intimidated by Plaintiff. (Def.'s 56.1 ¶ 13.) In his letter, Raymond recommended that Plaintiff be given a fitness for duty examination by a psychiatrist. (Def.'s 56.1 ¶ 13.) Plaintiff grieved Raymond's actions, and the matter was resolved with the help of the union. (Def.'s 56.1 ¶ 13.)

Early in the morning on September 12, 1996, Raymond told Plaintiff to come into his office to talk about the events of September 11, 1996. (Def.'s 56.1 ¶ 14.) Atchue was present and took notes. (Def.'s 56.1 ¶ 14.) Raymond asked Plaintiff if he had any weapons with him. (Def.'s 56.1 ¶ 15.) According to Atchue, Plaintiff became very angry. (Def.'s 56.1 ¶ 15.) Plaintiff admits that he

was offended by this question. (Def.'s 56.1 ¶ 15.) Plaintiff was taken aback by Raymond's question. (Pl.'s 56.1 ¶ 10.) Plaintiff stated that his entire body was a weapon and that he was going to "fucking" sue Raymond if Raymond searched him or called the police and found no weapon. (Def.'s 56.1 ¶ 15.) Raymond testified that he tried to calm Plaintiff down and tried to ask him about White's statements. (Def.'s 56.1 ¶ 16.) Plaintiff said, "I'm going to do what I fucking want to do, and you can't do shit about it." (Def.'s 56.1 ¶ 16.) When Raymond told Plaintiff to leave the building, Plaintiff called him a "fucking fat-ass wimp" and told him to "kiss [my] dick". (Def.'s 56.1 ¶ 16.) According to Raymond, Plaintiff's comments exacerbated his concerns. (Def.'s 56.1 ¶ 16.)

On the following day, September 13, 1996, Raymond sent a letter to the medical unit asking for a professional opinion on the likelihood of Plaintiff's acting on his verbal threats and animated gestures before Raymond issued any discipline. (Def.'s 56.1 ¶ 17.) Raymond placed Plaintiff on emergency off-duty status because of Plaintiff's intimidating and threatening behavior on September 11 and 12, 1996. (Def.'s 56.1 ¶ 18.) September 12, 1996 was the last day Plaintiff worked at the Bellwood Post Office. (Def.'s 56.1 ¶ 18.)

Plaintiff was examined by a psychiatrist, Dr. Marvin J. Schwarz, in late September 1996, to determine whether Plaintiff was fit to perform the duties of a letter carrier without danger to himself or others and, if not, to determine what accommodations could be made. (Def.'s 56.1 ¶ 19.) In addition to meeting with Plaintiff, Dr. Schwarz reviewed Plaintiff's personnel materials, medical records, and the 1994 and 1996 statements of various postal employees describing Plaintiff's unusual and inappropriate behavior. (Def.'s 56.1 ¶ 20.)

During the meeting with Dr. Schwarz, Plaintiff did not dispute engaging in that sort of behavior but, instead, justified his behavior by saying that he was just singing songs and only

threatened people who discriminated against him or did not treat him properly. (Def.'s 56.1 ¶ 20.) When Dr. Schwarz suggested to Plaintiff that his behavior was inappropriate and that he needed treatment, Plaintiff said that there was nothing wrong with his behavior and that he did not need treatment. (Def.'s 56.1 ¶ 20.)

Dr. Schwarz considers Plaintiff to be unable to function and unfit for duty in the USPS. (Def.'s 56.1 ¶ 20.) Dr. Schwarz stated that Plaintiff has a "paranoid distortion of reality" and "angry, explosive and hostile feelings which he cannot control". (Def.'s 56.1 ¶ 20.) Dr. Schwarz also stated that there were "significant issues of dangerousness". (Def.'s 56.1 ¶ 20.) Finally, Dr. Schwarz stated that "[s]ince Plaintiff sees nothing wrong with himself and sees no need to change, he does not appear to be a candidate for treatment"; and Dr. Schwarz knows "of no reasonable accommodation for such behavior within the postal service." (Def.'s 56.1 ¶ 20.) Plaintiff, himself, does not believe that he has a mental handicap and has not sought an accommodation from the USPS for a mental handicap. (Def.'s 56.1 ¶ 21.)

In October and November 1996, Raymond received letters from physicians in the medical unit summarizing Dr. Schwarz's findings and conclusions. (Def.'s 56.1 ¶ 22.) These letters stated that (1) Plaintiff was a threat to his coworkers and unfit for duty, (2) psychiatric treatment was recommended but that there are no guarantees of its success, and (3) "[p]ending such treatment there is no reasonable accommodation that would make Plaintiff fit for duty." (Def.'s 56.1 ¶ 22.)

On December 3, 1996, Atchue and Raymond issued a notice of removal to Plaintiff. (Def.'s 56.1 ¶ 23.) The notice stated that Plaintiff would be removed from the USPS but that the effective date of the removal would be determined at a later date. (Def.'s 56.1 ¶ 23.) The primary reason given for the removal was Plaintiff's physical inability to perform his duties as a letter carrier and

failure to secure a transfer to an available clerk position. (Def.'s 56.1 ¶ 23.) The notice also stated that Plaintiff had been found psychologically unfit for duty and, therefore, would remain in his current leave-without-pay status until an effective date was set for his removal. (Def.'s 56.1 ¶ 23.)

Plaintiff filed a grievance over that notice of removal. (Def.'s 56.1 ¶ 24.) The grievance was scheduled for arbitration on June 5, 1997. (Def.'s 56.1 ¶ 24.) On June 4, 1997, the union and the USPS reached a settlement agreement in which the December 3, 1996 notice of removal was rescinded. (Def.'s 56.1 ¶ 24.) Under the terms of the agreement, Plaintiff was to apply for disability retirement within seven days; and, if he did not, "management may issue the grievant an updated removal." (Def.'s 56.1 ¶ 24.)

Plaintiff did not apply for disability retirement. (Def.'s 56.1 ¶ 24.) Accordingly, Atchue and Raymond issued Plaintiff a second notice of removal. (Def.'s 56.1 ¶ 25.) The notice stated, in relevant part, that:

> You are hereby notified that you will be removed from the Postal Service, the effective date of which will be determined at a later date. The reason for this action is:
> "UNFIT FOR DUTY"
> On 9/30/96, a psychiatric fitness for duty examination was conducted by Marvin J. Schwarz, M.D. The results of this examination found you psychiatrically unfit for duty. Because of the nature of your illness, Dr. Schwarz could not recommend or foresee any reasonable accommodation which would allow you to return to duty.
>
> On June 4, 1997, you entered into a pre-arbitration agreement which rescinded a previous removal, issued to you on 12/3/96. In light of your current status, this settlement was designed to allow you an opportunity to initiate a disability retirement. On 6/17/97, you notified the personnel office that you were not interested in requesting disability retirement.
>
> * * *
>
> Please be advised that this removal is not intended to be disciplinary in nature, but rather an administrative action necessitated by the circumstances of your illness. You

will remain in your current off-duty status until the effective date of your removal. (Def.'s 56.1 ¶ 25.) Plaintiff filed a grievance over the second notice of removal; and, following an arbitration hearing, his grievance was denied. (Def.'s 56.1 ¶ 25.)

Defendant saw a letter dated July 21, 1997, from Dr. Grodman, which stated that after meeting with Plaintiff for three hours of psychotherapy, Dr. Grodman did not believe that Plaintiff had a paranoid personality disorder or an explosive disorder. (Pl.'s 56.1 ¶ 13.)

Following proceedings before the United States Equal Employment Opportunity Commission ("EEOC"), Plaintiff filed the instant action against Defendant. (Def.'s 56.1 ¶ 26.)

## DISCUSSION

Defendant moves for summary judgment, arguing that the USPS did not violate the Rehabilitation Act, 29 U.S.C. § 794 (2002), because: (1) Plaintiff could not perform the essential functions of a letter carrier, and USPS accommodated Plaintiff by identifying available clerk positions; and (2) Plaintiff is not a "qualified individual" entitled to protection under the Rehabilitation Act due to his violent and intimidating outbursts.

The Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of his or her disability, . . . be subjected to discrimination . . . by the United States Postal Service." 29 U.S.C. § 794(a). The Rehabilitation Act also provides that the standards used to determine whether the Act has been violated are those that are applied under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12111 *et seq.* 29 U.S.C. § 794(d); *see also Ozlowski v. Henderson*, 237 F.3d 837, 839 (7th Cir. 2001).

Under the ADA, an employer discriminates when it does not make "reasonable accommodations to the known physical or mental limitations" of an otherwise qualified employee

with a disability unless the employer can show "that the accommodation would impose an undue hardship on the operation of the business." 42 U.S.C. 12112(b)(5)(A). Reassignment to an alternative position is a reasonable accommodation. *Ozlowksi*, 237 F.3d at 840 (citing 42 U.S.C. § 12111(9)(B)). The employee must "satisfy the legitimate prerequisites for that alternative position and be able to perform the essential functions of the alternative position with or without a reasonable accommodation. *Ozlowski*, 237 F.3d at 840 (quoting *Dalton v. Subaru-Isuzu Automotive, Inc.*, 141 F.3d 667, 678 (7th Cir. 1998)).

"When . . . a disabled worker has communicated his disability to his employer and asked for an accommodation so that he can continue working, the employer has the burden of exploring with the worker the possibility of a reasonable accommodation." *Hansen v. Henderson*, 233 F.3d 521, 523 (7th Cir. 2000). An employer can do this by "initiat[ing] an informal, interactive process with the qualified individual with a disability in need of the accommodation." *Ozlowski*, 237 F.3d at 840 (citations omitted). But it is not enough for plaintiffs to show that the employer failed to engage in the interactive process to gain relief. *Ozlowski*, 237 F.3d at 840.

Defendant is entitled to summary judgment on Plaintiff's claim that USPS violated the Rehabilitation Act by not offering Plaintiff a reasonable accommodation because Plaintiff is not a "qualified individual" with a disability under the Act. When the disabled employee threatens coworkers, an employee with a disability ceases to be "qualified" under the Rehabilitation Act and the employer's duty to provide reasonable accommodations ends. *See Palmer v. Circuit Court of Cook County, Ill.*, 117 F.3d 351, 352-53 (7th Cir. 1997) (holding that threatening other employees disqualifies an individual from protection under the ADA). If an employer fires an employee because of his unacceptable behavior, the Rehabilitation Act is not implicated. *See Palmer*, 117 F.3d

at 352.

The evidence presented establishes that Plaintiff was separated from USPS because he threatened his coworkers. Plaintiff had been placed on emergency off-duty status in 1994 for threatening a coworker. On September 11, 1996, another coworker heard Plaintiff saying "bang, bang, shoot them up" and that Plaintiff was going to shoot all of the white rednecks, saw Plaintiff pointing his finger like a gun and making gunshot noises, and reported this conduct to Raymond. Even if Plaintiff was only singing a song and his coworker overreacted or disliked Plaintiff, as Plaintiff claims, his actions at the meeting with Raymond and Atchue were sufficient to cause USPS to believe that Plaintiff might pose a threat to his coworkers. Plaintiff testified that, after he was asked if he had a weapon, he blew up and began using profane language, telling Raymond that his entire body was a weapon. Moreover, Atchue and Raymond both testified that Plaintiff could not be calmed down and continued to use profanity in a loud voice. Furthermore, Dr. Schwarz and other doctors in the USPS medical unit found that Plaintiff was a threat to his coworkers and unfit for duty, needed psychiatric treatment, and that, until Plaintiff received such treatment, there was no reasonable accommodation that would make him fit for duty. The Rehabilitation Act does not require employers to retain potentially violent employees. *See Palmer*, 117 F.3d at 352. Therefore, Plaintiff was not a "qualified individual" under the Rehabilitation Act, and USPS was not required to retain him or make reasonable accommodations. *See Palmer*, 117 F.3d at 353 ("But we cannot believe that this duty [to make reasonable accommodations to an employee's disability] runs in favor of employees who commit or threaten to commit violent acts.")

Even if Plaintiff were a "qualified individual" with a disability, summary judgment in favor of defendant would still be appropriate because USPS reasonably accommodated Plaintiff's physical

-11-

disability by helping him find a clerk's position. USPS initiated "an informal, interactive process" with Plaintiff to determine how it could reasonably accommodate his disability. When Plaintiff informed USPS of his disability, USPS had him examined by its own physician. After the USPS physician recommended reassigning Plaintiff to a clerk's position or a letter carrier position that did not require climbing stairs and it was determined that no such positions were available at the Bellwood Post Office, Raymond gave Plaintiff a list of forty-five post offices with available clerk positions, the district telephone directory, and time on the clock to call those post offices and arrange a transfer. Moreover, Plaintiff admits that he and his union representative called fewer than five of the post offices on the list.

Plaintiff argues that USPS did not reasonably accommodate him because it did not follow up on whether he had found a clerk position after Raymond gave him the list of available clerk positions. However, "both parties bear responsibility for determining what accommodation is necessary." *Bultemyer v. Fort Wayne Community Schs.*, 100 F.3d 1281, 1285 (7th Cir. 1996). "A party that obstructs or delays the interactive process is not acting in good faith. A party that fails to communicate, by way of initiation or response, may also be acting in bad faith." *Beck v. Univ. of Wis. Bd. of Regents*, 75 F.3d 1130, 1135 (7th Cir. 1996). Here, Plaintiff has not presented any evidence that USPS was obstructing or delaying the interactive process or otherwise failed to respond to his request for an accommodation. Rather, the evidence establishes that USPS responded to Plaintiff's request for a reasonable accommodation by providing him with a list of available alternative positions and that Plaintiff failed to act in good faith by calling less than five of the forty-five post offices with vacant clerk positions. Therefore, summary judgment in favor of Defendant is appropriate.

## CONCLUSION

For the reasons stated herein, Defendant's Motion for Summary Judgment is granted.

**IT IS SO ORDERED.**

_____
John W. Darrah, Judge
United States District Court

Date: April 18, 2005